PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | CASE NO. 1:20CR5 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE BENITA Y. PEARSON |
| ) | |
| DAMIAN BELL, ) | |
| ) | **MEMORANDUM OF OPINION AND** |
| Defendant. ) | **ORDER** [Resolving ECF No. 15] |

Defendant Damian Bell moved the Court to suppress evidence and conduct a hearing. ECF No. 15. The government filed a response in opposition. ECF No. 17. Defendant filed a reply brief. ECF No. 20. The Court held a suppression hearing.[1] Having fully considered the record and relevant law, Defendant's motion is denied.

**I. Background**

Defendant was sentenced to two years of community control under Ohio Rev. Code. § 2929.15 for one count of Tampering with Evidence, two counts of Possession of Drugs, and four counts of Trafficking in Drugs. ECF No. 17 at Page ID #: 123-24. Defendant's community control release came with many conditions, including that Defendant obey federal, state, and local laws; that he not purchase, possess, own, use or have under his control any firearm; and agree to warrantless searches. ECF No. 17-1 at PageID #: 139, ¶¶ 1, 4, 7. The warrantless search condition permits his supervising officer and other authorized personnel of the Ohio Department

---

[1] *See* Minutes of Proceedings, August 10, 2020.

(1:20CR5)

of Rehabilitation and Correction to search "[his] person, motor vehicles, place of residence, personal property, or property that he has been given permission to use." *Id.* ¶ 7. Defendant acknowledged that he understood and agreed to follow the conditions of his community control release. ECF No. 17 at PageID #: 140.

## II. Hearing

The following evidence was produced at the suppression hearing. Adult Parole Authority ("APA") Officer David Gaul was assigned to supervise Defendant beginning in June 2019. As part of his duties, Officer Gaul routinely conducted unannounced home visits to probationers and parolees that he supervised.[2] Officer Gaul testified that home visits ensure that the probationers are still living at the residence and abiding by the terms of their probation conditions. Defendant informed Officer Gaul in September 2019 that Defendant was changing his place of residence to the home owned by his father, Jeffrey Flowers.

During the week leading up to October 15, 2019, Officer Gaul received tips that Defendant was selling drugs from that residence and possessed a firearm. Officer Gaul testified that he received numerous anonymous calls claiming that Defendant was selling drugs at the residence and possessed a firearm. Officer Gaul testified that all the tips identified Defendant by name and the correct address where he resided---"Yeah, all the same. Damian, living at Loretta Court, dealing drugs, has a weapon." Officer Gaul stated that he was unaware whether the messages he received were from multiple individuals or one individual repeatedly calling. He

---

[2] Although Officer Gaul testified that he no longer supervises probationers, he did so during the relevant time frame pertaining to the motion to suppress.

2

(1:20CR5)

noted that it was always a male voice but could not state the exact number of phone calls he received.

Officer Gaul also noted that he received information from at least one known, reliable resource, Jeffrey Flowers, Defendant's father. Contrary to the anonymous tipster(s), Officer Gaul spoke to Flowers *via* telephone. According to Officer Gaul, Flowers had previously been a parolee supervised by the APA.[3] The information that Officer Gaul received from Flowers corroborated the anonymous messages that Gaul was receiving. Although he did not remember who Flowers was at first, Officer Gaul testified that Flowers jogged his memory about their past interactions when they spoke.

On October 15, 2019, APA Officer Gaul was with APA Officer Thomas Guyer while working as part of the U.S. Marshal's Violent Fugitive Task Force ("the Task Force"), a partnership between federal and state officials to apprehend violent fugitives in the Northern District of Ohio.[4] Based on the information that Officer Gaul had received, Officer Gaul planned to conduct a home visit of Defendant's residence. Given that the tips indicated that Defendant possessed a firearm, Officers Gaul and Guyer also brought Officer Dana Isom, and Lorrain Police Department ("LPD") Officer Ed Soto to Defendant's residence. All four officers were members of the Task Force. The officers wore bulletproof vests with the U.S. Marshals insignia.

---

[3] Additional credible contact with Flowers is described on the record.

[4] *Northern District of Ohio-Task Force Information*, U.S. Marshals Service, https://www.usmarshals.gov/district/oh-n/taskforces/ (last visited Sept. 30, 2020).

3

(1:20CR5)

When the four officers arrived at Defendant's residence, Officer Gaul knocked on the front door.[5] ECF No. 17 at PageID #: 125; Government's Ex. 3 and 4. Defendant's then-girlfriend, Kamrey Brooks-Haynes, who was living with Defendant, answered the door. *Id.* Ms. Brooks-Haynes testified that Officer Isom was her relative and she opened the door, in part, because she recognized her aunt. Officer Gaul testified that Brooks-Haynes said she did not know where Defendant was and that she thought he may have been at the barber shop. Officer Gaul asked her to call Defendant and she began to fidget with her phone and looked back toward the kitchen/hallway area. Government's Ex. No. 5-6.

The parties dispute whether the officers were given consent to enter the residence. Officers Gaul and Guyer claim that Brooks-Haynes stepped back and made a gesture suggesting she was welcoming them in the home. Brooks-Haynes, on the other hand, testified that she only opened the door to speak with the officers and then one of the parole officers forcefully opened the door with his foot and the officers entered the residence without her permission.

Officer Gaul testified that he heard a noise coming from somewhere other than where they were in the house.[6] Unaware of where the sound was coming from, Officer Gaul identified himself and called out for Defendant. Officer Gaul advanced toward the kitchen and came to a half wall and a hallway. Government's Ex. 5-6. On the right of the kitchen is a hallway.

---

[5] Officer Gaul testified that Officer Soto remained outside of the residence to scope the perimeter.

[6] Officer Guyer testified that he does not recall whether he heard a sound in the residence when they were speaking to Brooks-Haynes.

(1:20CR5)

Government's Ex. 5-6. At the end of the hallway, there are bedrooms on the left and right. *See* Government's Ex. 6. Officer Gaul testified that Defendant came out of the last bedroom on the left of the hallway. ECF No. 17 at PageID #: 126; Government's Ex. 6-7. Officer Gaul testified that Defendant came at the officers hurriedly, although he was hesitant to describe it as running at them. The officers detained Defendant and handcuffed him. Brooks-Haynes informed the officers that her infant was asleep in one of the bedrooms.[7] Because the door to the room that Officer Gaul was told the infant was sleeping in was closed, he did not permit Brooks-Haynes to get the child until he conducted a safety sweep of the room to ensure no one else was hiding in there.[8]

While Officer Guyer remained with Defendant in the living room, Officer Gaul conducted a safety sweep of the residence.[9] Officer Gaul entered the last bedroom on the right at the end of the hallway (where, Gaul was informed, that the child was sleeping). Government's Ex. 8-11. This room was directly across the hallway from where Defendant had exited. Government's Ex. 8-11. The door on the right, according to Officer Gaul's testimony, was closed. Officer Gaul testified that he opened the door and saw the infant sleeping at the left side near the head of the bed. Government's Ex. 8. Officer Gaul said that he entered the room to see

---

[7] Officer Gaul testified that Defendant may have also mentioned the child sleeping in the room as well.

[8] Brooks-Haynes testified that Officer Soto retrieved the infant because the officers would not let Brooks-Haynes do so.

[9] Officer Guyer testified that another officer may have accompanied Officer Gaul while he did a sweep of the residence.

(1:20CR5)

if there was any other individual hiding underneath the other side of the bed. Government's Ex. 8. In that room, Officer Gaul spotted apparent controlled substances and baggies and a scale with residue on the top of the dresser. Government's Ex. 9-11. After Officer Gaul saw no one else was in the room, Brooks-Haynes was permitted to take her child from the room while Officer Gaul stood by the door.

Officer Gaul asked Defendant for his consent to search the residence and Defendant refused to provide consent. As a result, Officer Gaul contacted the LPD, which subsequently obtained a search warrant and found more apparent drugs and drug paraphernalia.[10] ECF No. 17 at PageID #: 127. The officers conducted a field test of the drug-like substance, which tested positive for cocaine. *Id.* Although officers found a magazine, no firearm was recovered during the LPD's subsequent search of the home.

Defendant was indicted with two counts of Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). ECF No. 7.

**II. Law and Analysis**

Defendant seeks to suppress the evidence the officers obtained during the search and the fruits of that search as a violation of his Fourth Amendment rights. The government advances three different bases for denying Defendant's motion to suppress: (1) the parole officers' home visit is not considered a search under the Fourth Amendment; (2) if the Court finds it was a

---

[10] Defendant does not challenge the validity of the search warrant but, nevertheless, seeks to suppress evidence seized during the subsequent search. *See* ECF No. 15 at PageID #: 119.

6

(1:20CR5)

search, the officers had reasonable suspicion; or (3) the totality of the circumstances demonstrate the probation search was reasonable.  The Court considers each issue raised below.

### A. "Home Visit"

The government contends that reasonable suspicion was not required because the incident on October 15, 2019 was nothing more than a routine home visit permitted by the terms of Defendant's community control.

Other circuits have determined that a "home visit" conducted by probation officers are not considered a search under the Fourth Amendment because probationers have no reasonable expectation of privacy during such a home visit.  *See United States v. LeBlanc*, 490 F.3d 361, 367-70 (5th Cir. 2007); *United States v. Hedrick*, 146 F. App'x 871, 872 (9th Cir. 2005); *United States v. Reyes*, 283 F.3d 446, 457-62 (2d Cir. 2002).  The government concedes that the Sixth Circuit has not yet addressed whether routine home visits are subject to the reasonable suspicion standard under the Fourth Amendment.[11]  ECF No. 17 at PageID #: 129-30.  At least one district court within the Sixth Circuit has found that this "home visit" exception is cognizable. *United States v. Cofer*, No. 3:09–cr–010, 2009 WL 2824479, at *5 (S.D. Ohio Aug. 26, 2009) (citing cases for proposition, "home visit, unlike home search, does not require reasonable suspicion"). Another district court, while not explicitly addressing whether the "home visit" exception is

---

[11] Although the Sixth Circuit discussed the "home visit" exception, it did not squarely address whether such an exception to the Fourth Amendment should be recognized.  *See United v. Tessier*, 814 F.3d 432, 434 (6th Cir. 2016).

7

(1:20CR5)

colorable, found it was inapplicable under the circumstances in that case. United States v. Colon, No. 1:18-CR-350, 2018 WL 5815815, at * 5 (N.D. Ohio Nov. 7, 2018) (Polster, J.).

Even if the home visit exception applied, however, "the scope of what constitutes a 'home visit' is unclear." Colon, 2018 WL 5815815, at * 5.  At the suppression hearing, for example, the officers testified that they had been working in their capacity as officers of the Task Force in the morning leading up to visiting Defendant's residence.  Additionally, the officers wore bulletproof vests carrying the insignia of the U.S. Marshals.  Furthermore, it remains unclear why Officer Gaul waited until the day when he was acting in his capacity as a member of the Task Force to conduct a home visit given that he had received tips about Defendant the week prior to October 15, 2019.

On the other hand, "Ohio probation officers routinely conduct home visits." Cofer, 2009 WL 2824479, at *5.  The officers provided testimony that arguably indicates they were only there in their capacity as parole officers.[12]  Officer Guyer testified that the Task Force's role is to search for a fugitive that already has a warrant out for the arrest.  Additionally, Officer Guyer explained that some home visits may lead to a search and arrest of a probationer.  Furthermore, Officer Guyer explained that their duties as part of the Task Force had been completed for the day before the officers visited Defendant's residence.  Although the officers' bulletproof vest indicated that they were a part of the Task Force, Officer Guyer testified that the officers had not changed the placard indicating that they were acting in their capacity as parole officers.  To the

---

[12] The descriptors probation officers and parole officers are used interchangeably.

8

(1:20CR5)

extent Officer Gaul brought other officers to the residence, he testified it was out of concern for the officer's safety because the tips had indicated that Defendant possessed a weapon. *See United States v. Penson*, 141 F. App'x 406, 410 (6th Cir. 2005) ("[P]robation officers may properly request police assistance in executing their duties as probation officers.") (citation omitted).

Nevertheless, at least one district court within the Sixth Circuit has expressed hesitation to find that the home visit exception applies under similar circumstances. *See Colon*, 2018 WL 5815815, at *4-5. Additionally, the Fifth Circuit implicitly recognized that an officer's home visit may "cross the line from a home visit to a search." *LeBlanc*, 409 F.3d at 370; *see also Reyes*, 283 F.3d at 462 ("[A] home visit is far less intrusive than a *probation search*, probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under *Knights*.")[13] (emphasis in original). Because the Sixth Circuit has not squarely addressed the matter, and due to the conflicting evidence of whether the officers were acting as members of the Task Force as opposed to parole officers, the Court is hesitant to find that even if the home visit exception is colorable, it applies to the case at bar.

### B. Reasonable Grounds

Next, the Court considers whether the officers had reasonable suspicion that Defendant was violating the conditions of his probation. Under Ohio Rev. Code § 2967.131(C), a parole officer "may search, with or without a warrant . . . the place of residence of the individual or

---

[13] *United States v. Knights*, 534 U.S. 112 (2001).

9

(1:20CR5)

felon . . . if the field officers have reasonable grounds to believe that the individual . . . is not abiding by the law, or otherwise is not complying with the terms and conditions of the individual's conditional pardon or parole, transitional control, other form of authorized release, or post-release control."  The reasonable grounds standard "mirrors" the reasonable suspicion standard.  *United States v. Loney*, 331 F.3d 516, 521 (6th Cir. 2003).  The question is whether the parole officers "had reasonable grounds to suspect that Defendant was violating the terms and conditions of his parole."  *Id.*  "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person ... of criminal activity.'" *United States v. Lee*, 793 F.3d 680, 686 (6th Cir. 2015) (citations omitted).

As explained above, Officer Gaul received tips that Defendant was selling drugs and possessed a firearm.  Most of the tips were anonymous.  "Rarely can an anonymous tip by itself constitute a basis for reasonable suspicion."  *United States v. Hudson*, 405 F.3d 425, 432 (6th Cir. 2005).  In this case, however, Officer Gaul relied not only on anonymous tips but also information from at least one reliable source, Jeffrey Flowers.  Defendant had verified to Officer Gaul that he was living in Flowers' home, and Flowers indicated the illegal activity occurred in that residence.  Furthermore, as the record reflects, Officer Gaul testified that Flowers had provided credible information in prior successful cases.  Officer Gaul's reliance on a known informant's tip is sufficiently reliable under the Fourth Amendment.  *See, e.g.*, *United States v. Keeling*, 783 F. App'x 517, 522 (6th Cir. 2019) ("Evidence that an informant was known to the police and had provided reliable information in the past can establish a track record sufficient to

10

(1:20CR5)

show reliability.") (citation omitted); United States v. Greene, 250 F.3d 471, 480 (6th Cir. 2001) ("Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable.") (citations omitted). Officer Gaul also testified that the fact that the informant was a relative of Defendant led the officer to believe the information was reliable. Furthermore, that Flowers owned the home where the alleged illegal activity occurred and permitted his son to live there, even if Flowers himself did not reside in the property, is indicative that the tip to Officer Gaul about Defendant's conduct in that residence was reliable. See United States v. Noel, 659 F. App'x 284, 287 (6th Cir. 2016) ("Mitchell would have also been justified in suspecting that the caller frequented the Snowden Street address, as some of the information in the call—that 'Noel had a weapon in the home' and that he lived with his uncle—related to activity within the house."). Additionally, Flowers calling Officer Gaul directly reveals that Flowers knew that Defendant was under supervision. See id. at 288. Despite Flowers' insistence at the suppression hearing that he never called Officer Gaul before October 15, 2019, Flowers identified Damian Bell's probation officer, Officer Gaul, by name in a recording of a phone conversation between Flowers and Sergeant Camarillo on October 15, 2019. Relying on Flowers as an informant is sufficient to provide reasonable grounds that Defendant was violating the terms of his condition. This reliable tip corroborated the information provided in the anonymous tips.

Against this backdrop, the Court finds that the parole officers had reasonable suspicion that Defendant was violating the conditions of his probation. Because there was reasonable suspicion, Defendant's motion to suppress is denied.

(1:20CR5)

### C. "Totality of the Circumstances" & No Reasonable Suspicion

If the officers had no reasonable suspicion for the search, it would be of no moment. The Sixth Circuit has squarely held that officers need not have reasonable suspicion to conduct a search of a probationer who is subject to warrantless searches as a condition of his probation. *See United States v. Tucker,* 795 F. App'x 963, 965 (6th Cir. 2020) ("Moreover, in *United States v. Tessier*, 814 F.3d 432, 433-34 (6th Cir. 2016), we answered yes to the question '[w]hether, under the Fourth Amendment, a probationer whose probation order contains a search condition may be subjected to a search in the absence of reasonable suspicion.'") (alterations in original). When considering a motion to suppress of a probationer subject to a warrantless search condition, the *Tessier* court applied "the Fourth Amendment totality-of-the-circumstances reasonableness approach employed by the Supreme Court in *Knights.*" *Tessier*, 814 F.3d at 433.

Defendant's "consent to warrantless searches as a condition of his probation 'significantly diminished [his] reasonable expectation of privacy.'" *Tucker*, 795 F. App'x 963, at *2 (quoting *Knights*, 534 U.S. at 120) (alteration in original). On the other side, the Court finds that the officers had a legitimate interest in searching Defendant's residence. The warrantless search condition in Defendant's probation order "further[s] the two primary goals of probation [and community control]—rehabilitation and protecting society from future criminal violations." *Knights*, 534 U.S. at 119. Officers received information that Defendant was not only dealing drugs but also possessed a firearm. ECF No. 17 at PageID #: 125. Defendant cannot

12

(1:20CR5)

persuasively contend that "the suspicionless search[14] in this case did not serve legitimate law enforcement and/or probationary purposes." *Tessier*, 814 F.3d at 435. Considering the totality of the circumstances, the Court finds that the officers' search of his residence does not contravene the Fourth Amendment.

### III. Conclusion

For the reasons explained above, Defendant's motion is denied.

IT IS SO ORDERED.

| | |
|---|---|
| September 30, 2020 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson |
| | United States District Judge |

---

[14] A suspicionless search "refer[s] to a search for which the police have less than reasonable suspicion." *United States v. Tessier*, No. 3:13–00077, 2014 WL 4851688, at *6 n.2 (M.D. Tenn. Sept. 29, 2014).